FILED
2019 Oct-07  PM 03:40
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA,
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **DEBORAH F. GLASGOW,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CASE** |
| | ) | **NUMBER: _____** |
| **SUN LIFE ASSURANCE** | ) | |
| **COMPANY OF CANADA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## COMPLAINT

Comes now the Plaintiff, Deborah F. Glasgow, and hereby files her Complaint against Sun Life Assurance Company of Canada.

## PARTIES

1.     The Plaintiff, Deborah F. Glasgow ("Mrs. Glasgow"), is an insured under Community Health Systems, Inc., Long Term Disability Insurance Policy No. 10471-002 ("the Plan").

2.     Defendant, Sun Life Assurance Company of Canada ("Sun Life"), is the Administrator of the Plan.  Upon information and belief, Sun Life is a foreign corporation which conducts business generally in the State of Alabama and specifically within this District.

## JURISDICTION AND VENUE

3.     This action arises under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1001, et seq.  Plaintiff asserts claims for long term disability ("LTD") benefits, enforcement of ERISA rights and statutory violations of ERISA under 29 U.S.C. §1132.   This Court has subject matter jurisdiction under ERISA without respect to the amount in controversy or the citizenship of the parties.  29 U.S.C. §1132(a), (e)(1) and (f) and 28 U.S.C. §1131. Venue is proper in this district pursuant to 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b).

## INTRODUCTION

4.     The Plaintiff in this case was subjected to improper claim handling procedures by Sun Life as it exploited the shortcomings of ERISA as it relates to claims for "welfare" benefits to avoid paying Mrs. Glasgow's valid claim for disability benefits. The traditionally held purpose of the ERISA statute is "to promote the interest of employees and their beneficiaries in employee benefit plans." *Shaw v. Delta Airlines, Inc.*, 463 U.S. 85, 90 (1983).  Mrs. Glasgow, as an employee insured for disability, was supposed to be treated as a beneficiary by the Defendant as statutory fiduciaries. Instead, the Defendant has breached those duties and victimized Mrs. Glasgow by engaging in improper claim handling procedures.  As described in more detail below, the Defendant has clearly engaged

in bad faith claim handling and Mrs. Glasgow, at minimum, is entitled to *de novo* review and all relief that ERISA provides.

## STATEMENT OF FACTS

5.      Mrs. Glasgow is an insured for benefits under the Plan. Sun Life is the administrator of the Plan. The Plan provides insureds, like Mrs. Glasgow, LTD benefits.

6.      Mrs. Glasgow, a woman fifty-five (55) years of age, worked at Community Health Systems, Inc. as a Registered Nurse until her disabilities forced her to stop working on or about December 11, 2017.  Mrs. Glasgow's position required her to conduct a variety of duties, including assessing, planning, implementing, and evaluating care for assigned patients during a shift. Additionally, Mrs. Glasgow was responsible for managing all assigned personnel, supplies and equipment. The physical abilities required of her occupation include continuously walking and standing with frequent bending, lifting, carrying, and pushing.

7.      Mrs. Glasgow's medical disabilities include multiple sclerosis ("MS"), depression, and anxiety. The symptoms of her impairments and the side effects of the medications prescribed render Mrs. Glasgow unable to perform her occupation or any reasonable work.

8.      Mrs. Glasgow applied for LTD benefits on March 5, 2018, listing her

disabling impairments as her inability to walk due to left leg weakness, numbness/tingling from her elbows to her hands and knees to feet, and severe anxiety, depression, oppression, and anger related to stress.

9.      Mrs. Glasgow has been under the consistent treatment of Dr. Kyle Hudgens ("Dr. Hudgens") for her relapsing remitting multiple sclerosis.

10.     In attending physician statement dated March 3, 2018, Dr. Hudgens noted that Mrs. Glasgow "has RRMS [relapsing remitting multiple sclerosis]. She cannot participate in gainful employment due to her symptoms." Dr. Hudgens further noted that Mrs. Glasgow suffers from severe fatigue and intermittent weakness.

11.     On the same day, March 3, 2018, Mrs. Glasgow underwent a mental status examination conducted by her treating psychiatrist, Stephanie Richardson ("Ms. Richardson"). In attending physician statement, Ms. Richardson noted impairments affecting Mrs. Glasgow's ability to function in the following areas: interpersonal relations, occupational/social, sustain work performance, attention span, and concentration.

12.     In attending physician statement, Mrs. Glasgow's psychiatrist, Stephanie Richardson ("Ms. Richardson") noted that Mrs. Glasgow suffers from depression and anxiety as a result of her MS diagnosis and life circumstances. Ms. Richardson indicated that Mrs. Glasgow's functional capacity is limited by her

psychiatric condition through the pain she experiences related to MS and her coping skills negatively impact her interpersonal performance.

13.     On March 11, 2018, a benefits consultant from Sun Life contacted Mrs. Glasgow via telephone. During this conversation, Mrs. Glasgow noted that if she goes to Walmart she has to use a wheelchair cart. She further stated that she cannot do all of her laundry at once and if she does housework, she has to stop and take a nap. Most notably, Mrs. Glasgow mentioned that stress can induce her MS flares.

14.     Mrs. Glasgow's physical and mental impairments and the symptoms thereof would cause frequent absenteeism intolerable to the average employer.

15.     In April 3, 2018 Function Report completed for the Social Security Administration ("SSA"), Mrs. Glasgow noted that she can only lift less than ten (10) pounds, cannot squat without having to sit completely on the floor, cannot stand more than 5-10 minutes in one (1) spot. Mrs. Glasgow reported that she can walk without rest for about ten (10) minutes. Mrs. Glasgow stated that she has a housekeeper due to her inability to maintain household duties and chores. Additionally, Mrs. Glasgow noted that her memory is bad and she has to be reminded to take her medication by her husband daily.

16.     In April 4, 2018 Third Party Function Report completed for the SSA, Mrs. Glasgow's husband Mike Glasgow ("Mr. Glasgow") noted that Mrs. Glasgow

does not go anywhere unless he is with her. He describes Mrs. Glasgow's condition as being characterized by weak legs and arms, slowness in understanding, and mood swings. Mr. Glasgow stated that Mrs. Glasgow can only walk up to ten (10) minutes or so before requiring rest.

17.     On April 21, 2018, Sun Life had Mrs. Glasgow's medical records reviewed by Darcy Newton ("Ms. Newton") and Bonnie Schafer ("Ms. Schafer").

18.     Ms. Newton is a registered nurse.

19.     After a review of Mrs. Glasgow's medical records, Ms. Newton determined that the medical records do not support that Mrs. Glasgow has suffered a physical loss of function. There is no indication that Ms. Newton attempted to contact Mrs. Glasgow's treating physicians.

20.     After a brief review of Mrs. Glasgow's medical records, Ms. Schafer created a succinct report in which she indicated that Mrs. Glasgow has been diagnosed with major depressive disorder and generalized anxiety disorder, which appears supported by her longstanding symptoms but because of improvement in her symptoms on March 13, 2018, there was no longer support for psychiatric impairment. Ms. Schafer acknowledges Mrs. Glasgow's psychiatric impairments for roughly a one (1) month period of time from February 14, 2018 through March 12, 2018. There is no indication that Ms. Schafer attempted to contact Mrs. Glasgow's treating physicians.

21.     By letter dated May 14, 2018 to Sunlife, Dr. Hudgens stated that Mrs. Glasgow was "being treated for MS with associated fatigue, severe pareasthesias and pain. This diagnosis may make it difficult for Mrs. Glasgow to stay gainfully employed." (*See* Dr. Hudgens' Letter dated May 14, 2018, attached hereto as Exhibit "A").

22.     On May 15, 2018, as part of the investigatory process for the SSA, Mrs. Glasgow underwent a psychological examination performed by Sharon Waltz ("Dr. Waltz"). As a result of this evaluation, Dr. Waltz found that Mrs. Glasgow is mentally impaired and has constriction of interest and difficulty relating to others due to mental health symptoms.

23.     By letter dated May 17, 2018, Mrs. Glasgow was denied LTD benefits by Sun Life. The letter noted that the "medical records provided do not offer support that [she] has experienced a physical loss of function." The letter further stated that "updated diagnostics obtained did not support an exacerbation of her relapsing remitting multiple sclerosis."

24.     The Plan at issue, as governed by ERISA and relied upon to deny Mrs. Glasgow's long term disability benefits states, in part:

> **Total Disability or Totally Disabled** means during the Elimination Period and the next 24 months, the Employee, because of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation.

25.    On July 20, 2018, as part of the investigatory process for the SSA, Mrs. Glasgow underwent a Neurological Examination by Nasrollah Eslami ("Dr. Eslami"). Dr. Eslami found that Mrs. Glasgow had an unsteady gait that was slow and broad-based. She was unable to walk on toes, heels or tandem, and had difficulty squatting. Dr. Eslami recognized that Mrs. Glasgow suffers from relapsing-remitting multiple sclerosis. He noted that she has not been able to tolerate her medications and is prone to have more relapses in the future with or without treatment. Dr. Eslami noted incoordination and difficulty walking in addition to sphincter dysfunction, which limits Mrs. Glasgow's work-related activities such as ability to stand or walk for extended period of time, lift, carry objects, and travel.  (*See* Dr. Eslami's Neurological Examination dated July 20, 2018, attached hereto as Exhibit "B ").

26.    In the "history" section of Dr. Eslami's July 20, 2018 report, he stated "the MRI of the cervical spine did not show any cord lesion however brain MRI showed periventricular and high density lesion in the corpus callosum that is quite compatible with multiple sclerosis."

27.    By letter dated September 29, 2018, Mrs. Glasgow was approved for Social Security Disability Income ("SSDI") and scheduled to begin receiving benefits January 2019.

28.    The Social Security Administration found Mrs. Glasgow to be disabled under their rules on July 20, 2018 because she was found incapable of performing work and medical improvement is not expected.

29.    Beginning in July 2018 and through November 2018 Mrs. Glasgow completed a daily fatigue diary.

30.    By and through counsel in letter dated November 9, 2018, Mrs. Glasgow appealed the denial of her LTD benefits. (*See* Appeal letter without attachments dated November 9, 2018, attached hereto as Exhibit "C"). Mrs. Glasgow included with her appeal letter additional medical records outlining the decline of her condition.

31.    A website is cited in the aforementioned appeal letter detailing the fatigue associated with multiple sclerosis. As mentioned at this link and as written in the appeal letter, the following is true of "MS fatigue:"

- Generally, occurs daily
- May occur early in the morning, even after a restful night's sleep
- Tends to worsen as the day progresses
- Tends to be aggravated by heat and humidity
- Comes on easily and suddenly
- Is generally more severe than normal fatigue
- Is more likely to interfere with daily responsibilities.

32.    Mrs. Glasgow participates in physical therapy for treatment of her symptoms associated with MS. Mrs. Glasgow is overwhelmed with fatigue following the therapeutic exercises performed at these appointments.

33.     With her appeal letter, Mrs. Glasgow submitted a declaration through which she outlined the effects of her disabling condition on her activities of daily living. Under penalty of perjury, Mrs. Glasgow noted "I am unable to stand in one place for longer than 3-4 minutes without my feet beginning to burn, ache and throb. . . My memory has decreased long-term, but especially short-term. I can't remember sometimes what someone just told me." She noted that the injections she is currently using for treatment cause her to be "completely down, or in bed all day, at least one day a week with flu-like symptoms; body aches, fever, nausea, diarrhea." Additionally, Mrs. Glasgow notes the sporadic nature of her MS flares. (*See* Declaration of Deborah Glasgow, attached hereto as Exhibit " D ").

34.     Additionally, by and through counsel in letter dated December 18, 2018, Mrs. Glasgow supplemented her appeal dated November 9, 2018, by submitting additional documentation supporting her disability including a copy of her Social Security file.

35.     Mrs. Glasgow's husband, Mike Glasgow ("Mr. Glasgow"), also submitted a declaration with the November 9, 2018 appeal letter for Sun Life's review. Under penalty of perjury, Mr. Glasgow stated that Mrs. Glasgow "has a hard time taking her shower and blow drying her hair without just being worn out and her hands tingling. She has to stop sometimes and just lay down on the bed for a few minutes until she can get back up to finish. I've noticed her memory

changing. She can't remember what I just told her and I have to tell her things several times for it to get through." (*See* Declaration of Mike Glasgow, attached hereto as Exhibit "E ").

36.     Beth Nail ("Ms. Nail"), Mrs. Glasgow's former coworker of four (4) years and friend, submitted a declaration for Sun Life's consideration as well. Under penalty of perjury, Ms. Nail stated that "before [Mrs. Glasgow] had to quit work she had to sit down all the time and could not handle all the tasks that were presented to her without a meltdown at times and almost a panic attack. She would be standing against the wall with her computer if there was nowhere to sit, she just slid down the wall and sat in the floor. Of course, this was unacceptable at work." (*See* Declaration of Beth Nail, attached hereto as Exhibit "F ").

37.     On January 7, 2019, Sun Life hired paid reviewer Sheila Schmitt ("Dr. Schmitt") to review Mrs. Glasgow's medical records. After a cursory review of the records, Dr. Schmitt determined that the records do not support functional impairment for Mrs. Glasgow's psychological conditions of anxiety disorder and major depressive disorder. Dr. Schmitt highlights the fact that Mrs. Glasgow is still able to function and complete her activities of daily living. In her report, Dr. Schmitt indicated that "although [Mrs. Glasgow] may experience symptoms, the frequency/severity thereof is not clear from the records." Dr. Schmitt further notes it is "not possible to appropriately differentiate if the symptoms reported by [Mrs.

Glasgow] are due to her MS or psychiatric conditions since both conditions share similar presentations and symptoms." There is no indication in Dr. Schmitt's review that she attempted to contact Mrs. Glasgow's treating physicians for comment or clarification.

38.     On January 10, 2019, Sun Life hired paid reviewer Sushil Sethi ("Dr. Sethi") to review Mrs. Glasgow's medical records. Following a cursory review of Mrs. Glasgow's records, Dr. Sethi determined "there is no clinical data corroborating the reports of fatigue, weakness, neuropathy, or frequency/severity of MS flare-ups." As a result of his review, Dr Sethi reached the conclusion that the clinical data "does not corroborate [Mrs. Glasgow's] self-reported symptoms." Dr. Sethi described Mrs. Glasgow's impairments as "nonspecific self-reported complaints which are not associated with any deficits."

39.     Based on a Vocational Occupation Opinion attained by Sun Life on January 18, 2019, the exertional requirement of Mrs. Glasgow's occupation as a registered nurse is medium, i.e. exerting 20 to 50 pounds of force occasionally, and/or 10 to 25 pounds of force frequently, and/or greater than negligible up to 10 pounds of force constantly to move objects. The vocational opinion also noted that the mental demands of the occupation include: dealing with people, performing effectively under stress, attaining precise set limits, tolerances, and standards, and making judgments and decisions.

40.     Despite providing proof of her disability both before the denial of benefits and throughout the appeals process, Sun Life refused to award Mrs. Glasgow's LTD benefits and issued its final denial by letter dated January 22, 2019.

41.     As of this date, Mrs. Glasgow has been denied benefits rightfully owed to her under the Plan.

42.     Mrs. Glasgow has met and continues to meet the Plan's definition of disabled.

43.     Mrs. Glasgow has exhausted any applicable administrative review procedures and Defendant's refusal to pay benefits is both erroneous and unreasonable and has caused tremendous financial hardship on Plaintiff.

## STANDARD OF REVIEW

44.     Plaintiff hereby incorporates by reference each and every fact as if it was restated herein.

45.     "A denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

46.     When discretionary authority is clearly granted and "the insurer of an

ERISA plan also acts as a claims administrator, there is a structural or inherent conflict of interest that mandates a 'heightened' arbitrary and capricious standard of review." *Pinto v. Reliance Standard Life Ins. Co.*, 214 F.3d 377, 378 (2000).

47.    The Plan at issue here contains no clear language granting Sun Life discretionary authority to determine eligibility for benefits or to construe the terms of the Plan, entitling Plaintiff to *de novo* review.

48.    "Under certain circumstances, a plan administrator's failure to comply with the letter of the claims procedures outlined in ERISA requires court to eschew the more deferential arbitrary and capricious review normally applied to an administrator's discretionary decisions in favor of a more searching de novo review." *Halo v. Yale Health Plan*, 819 F.3d 42, 47 (2d Cir. 2016).

49.    "In other words, a plan's failure to establish or follow the claims-procedure regulation entitles the claimant to have his or her claim reviewed de novo in federal court." *Id.* at 53. An inability to "keep the beneficiary apprised to the claim assessment process" or "deliver "reasonably timely and detailed decisions" are invalid exercises of discretion. *Id.* at 47.

50.    Here, Sun Life did not provide adequate detail supporting their decision to deny Mrs. Glasgow's claim for long term disability benefits.

51.    In the alternative, if the Court finds that Plan is entitled to the heightened arbitrary and capricious standard of review, the denial of Plaintiff's

benefits constitutes a clear abuse of discretion as Sun Life's decision to deny Mrs. Glasgow's LTD benefits was arbitrary and capricious.

52.     Upon information and belief, Defendant evaluated and paid all claims under the LTD Plan at issue, creating an inherent conflict of interest.

53.     Defendant breached its fiduciary duty to Mrs. Glasgow by erroneously denying the LTD benefits to which she is entitled under the Plan.

## DEFENDANT'S WRONGFUL AND UNREASONABLE CONDUCT

### A.     Defendant's Denial of Plaintiff's LTD Benefits was both Erroneous and Unreasonable.

54.     Plaintiff hereby incorporates by reference each and every fact as if it was restated herein.

55.     Courts have held that the determinations of plan administrators will be overturned when such determinations are without reason or erroneous as a matter of law. *Pinto v. Reliance Standard Life Ins. Co.*, 214 F.3d 377, 378 (2000).

56.     Throughout the entirety of the claim review process, Sun Life "cherry-picked" Mrs. Glasgow's records for information supporting its denial.

57.     In his report, paid reviewer Dr. Sethi, through his report seemingly suggested that unspecified objective diagnostic procedures be used to validate Mrs. Glasgow's MS when no such procedure is available.

58.     Furthermore, Mrs. Glasgow's medical records were misconstrued by Sun Life as it interpreted the medical records to reflect that Mrs. Glasgow is

capable of performing work when the physicians whose records were analyzed have written letters stating their blatant opinions that Mrs. Glasgow is *not* capable of returning to work.

59.    In its review, Sun Life denied the existence of objective evidence indicating that Mrs. Glasgow has MS despite the presence of such evidence in the claim file.

60.    Accordingly, Defendant's contention that Mrs. Glasgow failed to prove that she was disabled under the Plan must be rejected as Sun Life's decision to deny Plaintiff's benefits necessarily imposed a standard that was not required by the Plan's provisions. *See Soucy v. First UNUM Life Ins. Comp.*, 2011 U.S. Dist. LEXIS 27938*89-90.

61.    Defendant's decision to deny benefits under his LTD policy was erroneous and grossly unreasonable.

**B.    Defendant's Denial of Plaintiff's LTD Benefits was not Supported by Substantial Evidence.**

62.    Plaintiff hereby incorporates by reference each and every fact as if it was restated herein.

63.    Defendant's actions, as referenced above, entitle the Plaintiff to a *de novo* standard of review pursuant to § 1132(a)(1)(B).

64.    However, should this Court determine that Defendant is entitled to a heightened arbitrary and capricious standard of review, Defendants has failed to

support the denial of benefits with substantial evidence as required by law.

65.    The *Pinto* Court held that "[u]nder the arbitrary and capricious standard, an administrator's decision will only be overturned if it is without reason, unsupported by substantial evidence or erroneous as a matter of law[.]" *Id.* at 378.

66.    The final denial letter, like the previous letters, improperly found that Mrs. Glasgow had no physical or mental functional impairment which would preclude her from performing her own occupation. This determination was made through Sun Life's "cherry-picked" assessment of the record for evidence that supports its denial and gives little or no weight to the plethora of evidence that supports Mrs. Glasgow's disability.

67.    Sun Life primarily relied on the independent medical reviews of physicians that have neither personally observed nor examined Mrs. Glasgow.

68.    In Sun Life's initial denial letter dated May 17, 2018, it relied on the opinions of two paid medical reviewers, Ms. Newton and Ms. Schafer.

69.    Ms. Newton is a registered nurse, coincidentally with the same knowledge and expertise as the claimant, Mrs. Glasgow. Mrs. Glasgow contends that she is disabled. Ms. Newton does not have the requisite knowledge or experience to render a decision as to Mrs. Glasgow's disability.

70.    Ms. Newton determined that the medical records do not support a physical loss in function, despite the medical records she reviewed from Dr.

Hudgens stating just the opposite.

71.    Ms. Schafer determined that Mrs. Glasgow faced no psychiatric impairments yet acknowledged the presence of such impairments for roughly one (1) month, but did not identify any significant change in circumstances which would support those impairments vanishing suddenly. Mrs. Schafer highlights the "improvement" in symptoms noted by Mrs. Glasgow's psychiatrist. The improvement of Mrs. Glasgow's symptoms are exaggerated by Ms. Schafer to reflect full recovery from the psychiatric impairments that preclude her from working.

72.    Additionally, there is no indication that Ms. Newton or Ms. Schafer attempted to contact Mrs. Glasgow's treating physicians for comment or clarification. They merely misconstrued the medical records to reach the predetermined conclusion that Mrs. Glasgow is not disabled.

73.    Sun Life relied on the opinions of paid reviewers Sheila Schmitt ("Dr. Schmitt") and Sushil Sethi ("Dr. Sethi") in its final denial of Mrs. Glasgow's LTD benefits. There is no indication in the reports of these paid reviewers that either made an attempt to contact Mrs. Glasgow's treating physicians for comment or inquiry.

74.    In Dr. Schmitt's January 7, 2019 medical review report, she reasoned that Mrs. Glasgow faces no functional limitations because she is still able to

complete her activities of daily living. Dr. Schmitt failed to appreciate the vital role that Mr. Glasgow plays in completing such activities. The declarations that were submitted for Dr. Schmitt's review with "attorney correspondence and/or legal documents" clearly notate Mr. Glasgow's heavy assistance with his wife's activities of daily living.

75.    Dr. Schmitt reasoned that Mrs. Glasgow had no psychiatric impairments because she went on a vacation with her husband in February. Dr. Schmitt misconstrued an event scheduled for the betterment of Mrs. Glasgow's psychiatric condition as an indication that she suffers no psychiatric impairment whatsoever. Dr. Schmitt falsely assumes that Mrs. Glasgow would be engaged in activities that would require the same amount of mental strain as work. The activities required of Mrs. Glasgow's occupation as a registered nurse and the activities required of a vacation-goer starkly contrast in comparison to one another.

76.    After a cursory review of the medical records, Dr. Sethi determined that "there is no clinical data corroborating the reports of fatigue, weakness, neuropathy, or frequency/severity of MS flare-ups." Dr. Sethi highlights medical records where Mrs. Glasgow performed "normally" and ignores the sporadic nature of MS flare-ups, a key characteristic of the disease. Most egregiously, Dr. Sethi determines that "the clinical data does not corroborate her self-reported symptoms," wholly discounting Mrs. Glasgow's subjective complaints and the

diagnoses reached by her treating physicians.

77.     Further, Dr. Schmitt and Dr. Sethi developed medical conclusions that starkly contrast with that of the third party evaluators employed by the SSA. Dr. Waltz and Dr. Eslami both had the opportunity to perform a hands-on examination of Mrs. Glasgow in developing their medical opinions that are disputed by paid reviewers Dr. Schmitt and Dr. Sethi. Dr. Schmitt and Dr. Sethi did not have the same opportunity to develop a full and accurate medical opinion based on first hand examination like Drs. Waltz and Eslami.

78.     Moreover, Sun Life had the opportunity to conduct an independent medical examination of Mrs. Glasgow. Such an opinion would be more reliable than merely a review of the records.

79.     Even if the Defendant could somehow overcome the inadequacy of the paid reviewer's findings, the findings would still stand alone as the only such findings in the Administrative Record suggesting that Mrs. Glasgow might somehow have been able to return to work, and would remain overwhelmed by numerous treatment records suggesting the opposite. Accordingly, no reasonable mind could accept as adequate the evidence upon which the Defendant relied to support the decision to deny Mrs. Glasgow's benefits

80.     Sun Life's denial of Mrs. Glasgow's LTD benefits was made without the support of substantial evidence indicating that Mrs. Glasgow could perform the

material and substantial duties of her own occupation.

**C.    Defendant Wrongfully and Unreasonably Failed to Consider the Opinions of Plaintiff's Treating Physicians.**

81.    Plaintiff hereby incorporates by reference each and every fact as if it was restated herein.

82.    A court "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 834, 123 S. Ct. 1965, 155 L. Ed. 2d 1034 (2003).  The Court has recognized that "treating physicians, as a rule, have a greater opportunity than consultants to know and observe the patient as an individual." *Id.* at 832.

83.    "[C]ommon sense and a stream of legal precedent suggest [that] factual determinations of a treating physician are objectively more reliable." *Burt v. Metropolitan Life Insurance Co.,* No. 1:04-CV-2376-BBM, 2005 U.S. Dist. LEXIS 22810, at *33 (N.D. Ga. Sept. 16, 2005) (emphasis in original); *See also Finazzi,* 327 F. Supp. 2d at 795-96.

84.    Paid experts are more often than not pre-disposed or preconditioned. Courts have consistently expressed their skepticism of such "experts" and held their reviews to be the very essence of arbitrariness and capriciousness. *Bennett v. Kemper HAT-Svcs, Inc.* 514 F. 3d 547, 554-55 (6th Cir. 2008); *Montour v. Hartford Life and Acc. Ins. Co.,* 588 F. 3d 623 (9th Cir. 2009); *Regula v. Delta Family Care*

*Plan* 226 F.3d. 1130, 1143 (9th Cir. 2001).  The Supreme Court has acknowledged that "physicians repeatedly retained by benefits plans may have an 'incentive to make a finding of "not disabled" in order to save their employers money and preserve their own consulting agreements.'" *Nord,* 538 U.S. 822, 832, 123 S. Ct. 1965, 155 L. Ed. 2d 1034 (2003).  The fact that their reports are consistently in conflict with the opinion of treating doctors' determinations should be viewed as evidence of a structurally conflicted process that results in bias.  Clearly, in Mrs. Glasgow's case, these decisions indicate that her treating physicians' evaluations should be afforded greater weight than the opinions of Sun Life's consultants.

85.    In weighing the opinions of Mrs. Glasgow's physicians against those of the independent reviewers retained by the Defendant, the Court should consider the following factors: (i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) other relevant factors. *See Karanda v. Connecticut Gen. Life Ins. Co., et al.,* 158 F. Supp. 2d 192, 205 and n.8 (D. Conn. 2000) (citing *Durr v. Metropolitan Life Ins. Co.,* 15 F. Supp. 2d 205, 213 (D. Conn. 1998)).

86.    Mrs. Glasgow's claim file is replete with medical records from her treating physicians extensively detailing her physical and mental limitations. Mrs. Glasgow's physicians' assessments, treatment and medications they prescribed and

administered, demonstrate that Mrs. Glasgow's diagnosed conditions and symptoms thereof are extremely debilitating.

87.    Dr. Hudgens in particular has consistently treated Mrs. Glasgow for her relapsing remitting multiple sclerosis. Through his years of examination and treatment he is in the best position to attest to Mrs. Glasgow's disabling condition.

88.    Dr. Hudgens' medical records clearly notate Mrs. Glasgow's impairments and reflect his opinion that Mrs. Glasgow is not capable of returning to work in her own occupation or any reasonable occupation.

89.    Dr. Hudgens' March 3, 2018 letter stated that Mrs. Glasgow has relapsing remitting multiple sclerosis and cannot participate in gainful employment due to her symptoms. This letter is a clear indication that Dr. Hudgens finds Mrs. Glasgow disabled, despite his medical records that were misconstrued by Sun Life's paid reviewers.

90.    Additionally, Dr. Hudgens' May 14, 2018 letter stated that Mrs. Glasgow was "being treated for MS with associated fatigue, severe pareasthesias and pain. This diagnosis may make it difficult for Mrs. Glasgow to stay gainfully employed."

91.    In her attending provider statement, Ms. Richardson noted that Mrs. Glasgow suffers from depression and anxiety as a result of her MS diagnosis and life circumstances. Ms. Richardson indicated that Mrs. Glasgow's functional

capacity is limited by her psychiatric condition through the pain she experiences related to MS and her coping skills negatively impact her interpersonal performance. Clearly Mrs. Glasgow's physical impairments have contributed to her mental deficits.

92.     Mrs. Glasgow's long-standing medical providers, who have no stake in the outcome of the case, reached the opinion that she was disabled based on their numerous personal examinations, testing and procedures. These decisions were based on the same evidence that Mrs. Glasgow provided to Sun Life.  Sun Life's conclusion that Mrs. Glasgow was not disabled was based merely on hired reviewers' "cherry-picked" assessment of her medical records. *See Hoover v. Provident Life and Accident Ins. Co.*, 290 F.3d 801, 809 (6th Cir. 2002)(finding that evidence in the administrative record did not support the revocation of benefits because the only doctors that disagreed with the treating physicians were non-examining consultants hired by the insurance company); *see also Kalish v. Liberty Mutual*, 419 F.3d 501, 508 (6th Cir. 2005)("[w]hether a doctor has physically examined the claimant is indeed one factor that we may consider in determining whether a plan administrator acted arbitrarily and capriciously in giving greater weight to the opinion of its consulting physician").

93.     Mrs. Glasgow's treating physicians have stated that her condition is debilitating to the effect that she does not have the ability to return to work.

94.     Sun Life wrongfully failed to consider the well-informed opinions of Mrs. Glasgow's treating physicians and instead relied on the opinion of parties that have never seen nor examined Mrs. Glasgow in person.

**D.     Defendant Denied Plaintiff's LTD Benefits without Consideration of Plaintiff's Subjective Complaints.**

95.     Plaintiff hereby incorporates by reference each and every fact as if it was restated herein.

96.      "It is unreasonable for a disability claims administrator to deny a claim for a lack of objective medical evidence when the claimant has provided ample subjective evidence of a disability and the administrator has neither identified any objective evidence that the claimant could have supplied to support the claim and has not had the claimant undergo an independent medical examination or a similar in-person probative procedure to test the validity of her complaints." *Creel v. Wachovia Corp.*, 2009 U.S. App. LEXIS 1733, at 28* (11th Cir. Fla. Jan. 27, 2009).

97.     An administrator may not exclude a claim for lack of objective medical evidence unless that standard was made "clear, plain and conspicuous enough [in the policy] to negate layman [Plaintiff's] objectively reasonable expectations of coverage." *Saltarelli v. Bob Baker Group Medical Trust et al.*, 35 F.3d 382, 387 (9th Cir. 1994); See also May v. Metro. Life Ins. Co., 2004 U.S. Dist. LEXIS 18486, *26 (N.D. Cal. Sept. 9, 2004)("MetLife abused its discretion

by requiring that Plaintiff meet an additional requirement for eligibility beyond those imposed by the Plan."). As the Ninth Circuit has explained, some impairments are based on symptoms that are "entirely subjective."

98.     In *Quigley v. UNUM Life Ins. Co. of America,* 340 F. Supp. 2d 215, 224 (D.Conn. 2004), the Court held "[w]here the record reveals well-documented complaints of chronic pain, and there is no evidence in the record to contradict the claimant's complaints, the claim administrator, and the court, cannot discredit the claimant's subjective complaints." *Id.* at 224.

99.     Admittedly, Mrs. Glasgow's primary disabling impairments have subjective components; however, they have been diagnosed by her treating physicians based on her medical history, physical examinations, and observations. The Defendant far exceeds its discretion to ascertain a claimant's credibility by characterizing the bulk of Mrs. Glasgow's treatment records as somehow flowing from her own subjective reports and thus equally subject to its rejection as non-credible.

100.   Here, Mrs. Glasgow provided both objective and subjective evidence of her disabling conditions. Her medical records contain well-documented complaints of intermittent weakness, severe fatigue, cognitive difficulty, anxiety, and depression.

101.   The medical records of Mrs. Glasgow's treating physicians are riddled

with consistent complaints by Mrs. Glasgow. The nature of her subjective complaints are consistent with her diagnoses.

102.   The declarations submitted by Mrs. Glasgow, Mr. Glasgow and Ms. Nail all outline Mrs. Glasgow's difficulties with pain, weakness, memory loss, and fatigue.

103.   In denial letters dated May 17, 2018 and January 22, 2019, Sun Life failed to consider Mrs. Glasgow's subjective complaints. These letters also failed to address the deterioration, rather than improvement, of Mrs. Glasgow's conditions and the symptoms thereof.

104.   Sun Life's paid reviewers utterly disregarded the subjective complaints of Mrs. Glasgow. Dr. Sethi went as far as to say "the clinical data does not corroborate her self-reported symptoms." Dr. Sethi, through his report, is seemingly suggesting that unspecified diagnostic procedures be used to validate Mrs. Glasgow's MS when no such procedure is available.

105.   Moreover, Dr. Hudgens has had the time and opportunity to thoroughly examine Mrs. Glasgow's condition and properly diagnose her with relapsing remitting multiple sclerosis to the exclusion of other conditions. Dr. Hudgens properly considered Mrs. Glasgow's subjective complaints in addition to objective criteria in reaching this diagnosis.

106.   In the "history" section of Dr. Eslami's July 20, 2018 review, he

stated "The MRI of the cervical spine did not show any cord lesion however brain MRI showed periventricular and high density lesion in the corpus callosum that is quite compatible with multiple sclerosis." Clearly, there is objective evidence confirming Dr. Hudgens' diagnosis.

107. Accordingly, given Sun Life's utter disregard or Mrs. Glasgow's subjective complaints, Defendant's decision to deny benefits was substantively unreasonable.

**E.     Defendant Denied Plaintiff's LTD Benefits without Consideration of Plaintiff's Non-Exertional Limitations.**

108. Plaintiff hereby incorporates by reference each and every fact as if it was restated herein.

109. As reasoned by the Court in *Rabuck v. Hartford Life and Accident Ins. Co.,* 522 F. Supp. 2d 844 (W.D. Mich. 2007), in addition to exertional restrictions and limitations, the Court must also consider non-exertional limitations including (1) intellectual and psychological limitations, including those related to the side effects of prescription medications and pain; (2) limited manual dexterity; and (3) a limited ability to remain seated for an extended period of time. Such non-exertional limitations can be important aspects of vocational capacity. *Id.* at 876-77. (holding that failure to consider non-strength limitations of former company president with short-term memory limitations rendered Transferable Skills Analysis "incredible").

110.   Classifying a job based on its exertional qualifications alone "is the beginning, not the end, of determining the essential duties of an occupation." *Nemeth v. The Andersen Corp. Welfare Plan*, No. 10-cv-0795-wmc, U.S. Dist. LEXIS 190900, at *35 (W.D. Wis. February 1, 2012)(*See also Baker v. Metropolitan Life Ins. Co.*, No. 3:05-cv-262, 2006 U.S. Dist. LEXIS 92556 at *17 (M.D. Tenn. Dec. 20, 2006)("Although the practice of law is a physically 'sedentary' occupation, the claimant's occupation was in the sophisticated and demanding legal practice of mergers and acquisitions, and the vocational component of MetLife's termination of LTD benefits was arbitrary and capricious because it did not adequately take into account the claimant's cognitive deficits").

111.   Failure to consider side effects of medications in determining whether an ERISA claimant is disabled is an example of arbitrary and capricious conduct. *Godfrey v. BellSouth Telecommunications, Inc.*, 89 F.3d 755, 759 (11th Cir. 1996).

112.   Defendant denied Mrs. Glasgow's LTD benefits despite the fact that Mrs. Glasgow's medical records indicate that she was suffering side effects from the medication she was prescribed, including flu-like symptoms, body aches, fever, nausea, and diarrhea.

113.   The side effects of the medications and treatment prescribed were so vicious that Mrs. Glasgow discontinued use of many prescriptions because the side effects worsened her condition, rather than relieving it.

114.   One of the non-exertional limitations that Mrs. Glasgow faces is limited manual dexterity. Her medical records clearly notate restrictions lifting/carrying, standing, walking, stooping, kneeling, and crouching due to intermittent weakness, numbness, and tingling. Her inability to perform these important aspect of her occupation prevent her from returning to work.

115.   Fatigue is the strongest symptom limiting Mrs. Glasgow from continuing to work. Fatigue is a prominent characteristic of MS and the effects thereof cause inevitable exhaustion, limiting the amount of time a person can sit, stand, or be awake.

116.   Additionally, MS flare-ups cause distinct, sudden episodes of severe fatigue, numbness, tingling, and balance difficulties. Flare-ups are impossible to predict and can last for an unknown amount of time. The indeterminable consequences of these events make it impossible for Mrs. Glasgow to continue working.

117.   The physical aspects of the disease have also taken a toll of Mrs. Glasgow's mental health, resulting in issues with anger, depression, and anxiety.

118.   In Ms. Nail's declaration, she indicated that Mrs. Glasgow had difficulty standing for any length of time and would resort to sitting on the floor if seating were not readily available.

119.   In Dr. Eslami's July 20, 2018 neurological evaluation, he noted that

Mrs. Glasgow "has incoordination and difficulty walking in addition to sphincter dysfunction, which limits her work-related activities such as ability to stand or walk for extended period of time, lift, carry objects and travel."

120.   The court in Mills v. Colvin, 959 F. Supp. 2d 1079, 1084 (2013) stated that "the general tolerance of off-task time is around 10-12% and an individual who needed a ten-minute break every hour would exceed that tolerance."

121.   According to the medical records, Mrs. Glasgow experiences sphincter dysfunction, diarrhea, and other symptoms which would cause her to spend a significant amount of time off task.

122.   Another consideration of non-exertional requirements is an employee's ability to regularly attend work. Frequent absenteeism caused by medical appointments or conditions would preclude employment in any reasonable occupation. A majority of the Federal Courts have found that employers will not tolerate absenteeism averaging two or more days per month. *See Conner v. Shalala*, 900 F. Supp. 994, 1003-04 (1995) stating that "in unskilled work the tolerance level would not exceed two absences per month." *See also Dennis v. Astrue*, 665 F. Supp. 2d 746, 753 (2009) stating that "employers typically will tolerate no more than two absences per month."

123.   Mrs. Glasgow's concentration, persistence and pace is so severely

limited by constant fatigue, and by the documented and expected side effects from her prescribed medications that she is unable to perform any work at any exertional level on a full-time basis.

124. Additionally, while physical therapy plays a key role in Mrs. Glasgow's treatment, engaging in assigned therapeutic exercises further exacerbates her fatigue.

125. Undoubtedly, a return to work in any capacity would increase Mrs. Glasgow's symptoms and fatigue, requiring additional rest, medication and treatment which would lead to the inability to maintain an acceptable absentee rate.

126. Mrs. Glasgow's treating physicians consistently supported her disability claim in both treatment notes and medical statements provided to Sun Life and stated that Mrs. Glasgow suffered non-exertional limitations, such as inability to focus or concentrate and difficulty standing/sitting for long periods of time. Her disabling conditions also prevent her from "staying on task" at least 85% of the time and prevent consistent attendance at work. Plaintiff's secondary medical issues compound her primary problems and it was unreasonable for the Defendant to fail to properly consider the impacts of Mrs. Glasgow's non-exertional limitations in its decision.

127. If Mrs. Glasgow's non-exertional limitations were considered by Sun Life, it would have reached a different conclusion about Mrs. Glasgow's disability

status and her entitlement to LTD benefit payments.

128.   Clearly, a decision asserting that Mrs. Glasgow can gainfully work in her occupation given her non-exertional impairments and side effects from her medications is illogical.

129.   Accordingly, Defendant's decision to deny disability benefits was substantively unreasonable given the non-exertional limitations that preclude Mrs. Glasgow from performing the material and substantive duties of her own occupation.

**F.     Defendant Failed to Provide Plaintiff with a Full and Fair Review.**

130.   Plaintiff hereby incorporates by reference each and every fact as if it was restated herein.

131.    The ERISA statute provides, in part, that every plan must provide participants with an adequate notice of claim denials and "a reasonable opportunity . . . for a full and fair review by the appropriate named fiduciary of the decision denying the claim." 29 U.S.C. § 1233(2). The Department of Labor's regulations provide that every plan must establish a procedure 'under where there will be a full and fair review of the claim and the adverse benefit determination.'" 29 C.F.R. § 2560.503-1(h)(1).

132.   The Defendant did not establish and maintain a reasonable claim procedure or provide a full and fair review of Mrs. Glasgow's claim as required by

ERISA.

133.   In final denial letter dated January 22, 2019, Sun Life did not inform Mrs. Glasgow of the statute of limitations for her ERISA claim, as required by Department of Labor Regulations. While Mrs. Glasgow's claim is not governed by these regulations, which went into effect on April 1, 2018, by the time of the final denial letter, Sun Life was well aware of these regulations and the purpose of their enforcement.

134.   Additionally, Mrs. Glasgow was not given an opportunity to respond to the Physician Review Reports completed by Drs. Schmitt and Sethi nor was she granted an opportunity to submit the report to his physicians for comment.

135.   Accordingly, Defendant's denial of Mrs. Glasgow's LTD benefits denied the full and fair review of her LTD claim that she was entitled to under ERISA and therefore, Sun Life's decision to deny Mrs. Glasgow's LTD benefits was arbitrary and capricious.

**G.     Defendant Failed to Justify Taking a Position Different from the Social Security Administration ("SSA") on the Question of Disability.**

136.   Plaintiff hereby incorporates by reference each and every fact as if it was restated herein.

137.   Courts have determined that the Social Security Administration's disability decision should be a "significant factor" in a Court's consideration of an administrator's decision to deny plaintiff's disability benefits. *Glenn v. Metro Life*

*Ins. Co.*, 461 F.3d 660, 66. *See also Calvert v. Firstar Finance, Inc.*, 409 F.3d 286, 294 (6th Cir. 2005)("the SSA determination, though certainly not binding, is far from meaningless.").

138.   "[I]f the plan administrator (1) encourages the applicant to apply for Social Security disability payments; (2) financially benefits from the applicant's receipt of Social Security; and then (3) fails to explain why it is taking a position different from the SSA on the question of disability, the reviewing court should weigh this in favor of a finding that the administrator's decision was arbitrary or capricious." *Bennett v. Kemper Nat. Services, Inc.*, 514 F.3d 547, 554 (6th Cir. 2009).

139.   Indeed, "a decision by a plan administrator to seek and embrace an SSA determination for its own benefit, and then ignore or discount it later, casts additional doubt on the adequacy of their evaluation of . . . [a] claim[.]" *Calvert c. Firstar Finance, Inc.*, 409 F.3d 286, 294-95 (6th Cir. 2005). *See also Darland v. Fortis Benefits Insurance Company*, 317 F.3d 516 (6th Cir. 2003)("[I]t is totally inconsistent . . . to request that [a claimant] apply for social security disability benefits, yet avail itself of that social security determination regarding disability to contend, at the same time, that he is not disabled.").

140.   The Eleventh Circuit has previously held that insurance carriers have an "obligation to consider the evidence presented to the SSA." *Melech v. Life Ins.*

*Co. of N.A.*, 739 F.3d 663, 666 (11th Cir. 2014). The court further noted that it was "troubled by the implication of [the carrier's] actions . . . where it ignored [claimant's] SSDI application and the evidence generated by the SSA's investigation once it no longer had a financial stake in the outcome." *Id.* at 674.

141.   When considering whether a claimant is disabled under sections 216(i) and 223(d) of the Social Security Act, the agency must determine whether the claimant has the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.

142.   Under the authority of the Social Security Act, the Social Security Administration has established a five-step sequential evaluation process for determining whether an individual is disabled 20 CFR 404.1520(a).

143.   At step one, the agency must determine whether the claimant is engaged in substantial gainful activity 20 CFR 404.1520(b). If an individual engages in substantial gainful activity, he or she is not disabled regardless of how severe his or her physical or mental impairments are and regardless of his or her age, education, or work experience. If the individual is not engaged in substantial gainful activity, the analysis proceeds to the second step.

144.   At step two, the agency must determine whether the claimant has a

medically determinable impairment that is "severe" or a combination of impairments that is "severe." 20 CFR 404.1520(c). An impairment or combination of impairments is "severe" within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities. If the claimant does not have a severe medically determinable impairment or combination of impairments, he or she is not disabled. If the claimant has a severe impairment or combination of impairments, the analysis proceeds to the third step.

145.   At step three, the agency must determine whether the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1. 20 CFR 404.1520(d), 404.1525, and 404.1526. If the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of a listing and meets the duration requirement, the claimant is disabled. 20 CFR 404.1509. If it does not, the analysis proceeds to the next step.

146.   Before considering step four, the agency must first determine the claimant's residual functional capacity. 20 CFR 404.1520(e). An individual's residual functional capacity is his or her ability to do physical and mental work activities on a sustained basis despite limitations from his or her impairments.

147.   Next, the agency must determine at step four whether the claimant has the residual functional capacity to perform the requirements of his or her past

relevant work. 20 CFR 404.1520(f). The term "past relevant work" means work performed (either as the claimant actually performed it or as it is generally performed in the national economy) within the last fifteen (15) years or fifteen (15) years prior to the date that disability must be established. If the claimant is unable to do any past relevant work or does not have any past relevant work, the analysis proceeds to the fifth and final step.

148.   At the final step of the sequential evaluation process, the agency must determine whether the claimant is able to do any other work considering his or her residual functional capacity, age, education, and work experience. If the claimant is able to do other work, he or she is not disabled. If the claimant is not able to do other work and meets the duration requirement, he or she is disabled.

149.   After reviewing Mrs. Glasgow's medical records, the SSA determined that Mrs. Glasgow satisfied each step of the five-step process outlined above.

150.   Social security disability determinations are made through a more stringent analysis than that required under the Plan. Despite the ironclad method developed by the SSA, it still found Mrs. Glasgow disabled. Without justification, Sun Life disagreed with that determination, finding Mrs. Glasgow capable of performing her own occupation.

151.   Rather than addressing the substantive reason for their disagreement with the SSA determination, Sun Life merely attacked the analyses conducted by

third-party examiners utilized by the SSA. Additionally, in the final denial letter, Sun Life described a distinction between the two analyses, but failed to mention the more stringent nature and detail required of the SSA analysis.

152.   Sun Life erroneously disagreed with the SSA's determination of disability and failed to adequately consider such determination in analyzing plaintiff's claim for LTD benefits.

## CAUSES OF ACTION

## COUNT ONE
## ERISA (Claim for Benefits Owed under Plan)

153.   Plaintiff hereby incorporates by reference each and every fact as if it was restated herein.

154.   At all times relevant to this action, Mrs. Glasgow was a participant of the Plan underwritten by Sun Life and issued to Community Health Systems, Inc. and was eligible to receive disability benefits under the Plan.

155.   As more fully described above, the denial and refusal to pay Mrs. Glasgow's benefits under the Plan for the period from at least on or about March 14, 2018 through the present constitutes a breach of Defendant's obligations under the Plan and ERISA.  The decision to deny benefits to Mrs. Glasgow constitutes an abuse of discretion as the decision was not reasonable and it was not based on substantial evidence.

156.   Ms. Glasgow brings this action to recover benefits due to her and to

enforce her rights under the Plan pursuant to 29 U.S.C. §1132(a)(1)(B).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays the Court to enter judgment for Plaintiff and otherwise enter an Order providing that:

1.    The applicable standard of review in this case is *de novo*;

2.    By a preponderance of the evidence, the Defendant has breached its fiduciary duty to the Plaintiff by wrongfully denying her LTD benefits owed to her through the Plan;

3.    In the alternative, if the court determines that the applicable standard of review is the heightened arbitrary and capricious standard, the court may take and review the records of Defendant and any other evidence that it deems necessary to conduct an adequate arbitrary and capricious review;

4.    From at least December 13, 2017 through the present, Mrs. Glasgow met the Plan's definition of disabled;

5.    Defendant shall pay Mrs. Glasgow all benefits due for the period from at least March 2018 through the present in accordance with the Plan;

6.    Defendant shall pay to Plaintiff such prejudgment interest as allowed by law;

7.    Defendant shall pay Plaintiff's costs of litigation and any and all other reasonable costs and damages permitted by law;

8.      Defendants shall pay attorney's fees for Plaintiff's counsel;

9.      Plaintiff shall receive such further relief against Defendant as the Court deems lawful, just and proper.

Respectfully submitted this the 7th day of October, 2019.

                        */s/ Peter H. Burke*
                        Peter H. Burke (ASB-1992-K74P)
                        PBurke@burkeharvey.com
                        BURKE HARVEY, LLC
                        3535 Grandview Parkway
                        Suite 100
                        Birmingham, Alabama 35243
                        Phone:  205-930-9091
                        Fax:   205-930-9054

                        *Attorney for Plaintiff Deborah F. Glasgow*

 **PLEASE SERVE DEFENDANTS BY CERTIFIED MAIL AT:**

CT Corporation System
Sun Life Assurance Company of Canada
2 North Jackson Street
Suite 605
Montgomery, AL  36104